Stanislaw IGNATYUK, Libelant,

v.

TRAMP CHARTERING CORP., a foreign corporation and THE vessel ANNITSA, its tackle, apparel, etc., Respondents,

and

Connecticut Terminal Company, Inc., and Canadian Transport Co., Ltd., Respondents-Impleaded.

United States District Court
S. D. New York.
March 17, 1955.

Shafter & Shafter, New York City, Robert Klonsky and Jack Steinman, New York City, of counsel, for plaintiffs.

Frederick H. Cunningham, New York City, for Tramp Chartering Corp., defendant.

Galli & Locker, New York City, Patrick J. McCann and Ralph H. Terhune, New York City, for Connecticut Terminal Co., Inc., respondent, impleaded.

Burlingham, Hupper & Kennedy, New York City, Eugene Underwood, New York City, and Robert Pohl, Brooklyn, N. Y., Attorneys for Canadian Transport Co. Ltd., respondent, impleaded.

EDELSTEIN, District Judge.

The above-entitled action having come on to be tried before me on February 16, 17, 18, 21 and 23, 1955. I find from all the evidence and pleadings that:

### Findings of Fact

1. On October 15, 1953, at approximately 8:00 a. m., the libelant, as a longshoreman employee of Connecticut Terminal Company, Inc., an impleaded respondent herein, boarded the vessel Annitsa, then moored starboard side to the State Pier in New London, Connecticut, for the purpose of discharging lumber cargo.

2. The Annitsa was then and there owned and operated by the respondent Tramp Chartering Corp., on whose behalf its time charterer Canadian Transport Co., Ltd., an impleaded respondent herein, contracted for the stevedoring services of Connecticut Terminal Company, Inc.

3. The vessel was laden with a cargo of 5,837,380 FBM (feet board measure) of dressed lumber, of varying lengths. On deck the lumber was stowed to a height of about nine to ten feet, running in a fore and aft direction, and at and about Number 5 hatch, whereat libelant worked, the deck cargo covered virtually the entire deck space and all the permanent ship's fittings for rigging booms, except that a certain cleat about eight feet aft of the Number 5 winches, on the port side, was left uncovered in a space measuring about one foot square.

4. Before the longshoremen boarded the Annitsa, the two 5 ton wooden booms, had been raised by the ship's crew and secured by regular guys, consisting in part of manila rope and in part of wire cable. The manila rope was black, old and rotten, and ran continuously three or four times through two blocks, with the lower block attached at the deck level.

5. Shortly after boarding the vessel, the hatch foreman Barry supervised the rigging of a preventer guy, which resembled an old winch runner, to the exposed cleat referred to above. This was for the purpose of supplementing the regular guy of the port or offshore boom, which was used as the up and down boom in the unloading operation at Number 5 hatch. As there was no space to work on the deck, in order to secure this preventer guy, two longshoremen, Reidy and Peret, had to and did place themselves outside the rail, each holding on to hand hooks dug into the lumber. As Reidy fed the preventer guy to Peret, the latter wound the cable in a figure eight manner about the wings of the cleat. The first

turn was made about the aft wing of the cleat, then to Peret's right as he faced the vessel from his offshore position. The preventer guy was about ¾ inch in diameter, and the cleat was of forged steel, having two wings, each wing about eight inches long and parallel to the deck as well as to the side of the vessel.

6. The port offshore boom was spotted so that a plumb line from the top would go down to about the middle of the hatch coaming on the port side. The starboard inshore boom, intended as the Burton or drag boom, was spotted over the dock onto which drafts of lumber were to be placed.

7. At Number 5 hatch there were 4 teams, two men to a team, directed to make up drafts of lumber from the deck cargo. The chains on both sides of the deck cargo, affixed to padeyes on the deck, were joined by turnbuckles on top which the longshoremen loosened prior to making up their drafts. Each draft of lumber consisted of wooden boards, approximately 30 inches in height, 48 inches in width, and varying in length, the average length being 14 feet. Libelant and his partner were stationed in the starboard-aft section of the hatch. The other teams were in the starboard-forward, port-forward and port-aft sections, all making up drafts of lumber, removed in regular sequence by attaching a cargo hook to wire slings about the drafts.

8. The falls of both booms were "married" or joined, and after the up and down boom on the port side lifted a particular draft to a height sufficient to clear the other drafts, the winchman of the Burton or drag boom on the starboard side would on signal take a strain and bring the draft over to the inshore side to be lowered to the dock. At the time of this latter maneuver, most of the strain was on the drag boom, with a slight strain on the up and down boom.

9. At the time of the accident involved herein, which occurred at about 9:45 a. m. on October 15, 1953, the libelant was engaged in making up his draft of lumber on the starboard side of the hatch. A snapping sound was heard, both the regular guy and the preventer guy of the port boom swung toward libelant, one or both struck him and caused him to be flung in the air and come down with considerable force on the left side of his body. The particular operation at the time was the removal of the draft of lumber from the port side of the hatch, which had been raised by the port boom about four feet above the deck cargo, and was then being pulled by the starboard boom at a point about three feet from the dock. The major strain was then on the starboard boom.

10. After the accident it was observed that the forward wing of the cleat to which the port preventer guy had been secured was raised in a position vertical to the deck, and that the manila rope of the regular guy had broken, leaving frayed ends.

11. The breaking point for manila rope fit for its purpose, considering the number of strands then in use, is established to be approximately sixteen to eighteen tons. The weight of the draft at the time of the accident is established to be approximately 2.52 tons. The vessel was originally designed and built so that the regular guy by itself would withstand a stress sufficient to secure the 5 ton boom while maintaining a strain imposed by a weight equivalent to the draft herein.

12. As the padeye near the cleat involved was covered by the deck cargo, the rigging of the preventer guy directly to the cleat by the longshoremen was reasonable and proper under the circumstances, and in conformity with the Maritime Safety Code compiled by the Maritime Association of the Port of New York, wherein the following appears: "Guys, preventers and other lines should each be fastened to a separate cleat or ring bolt."

13. As the first turn of the preventer guy was about the after wing of the cleat, the major stress was on this wing. As the forward wing of the cleat bent upwards under normal stress, it follows that the forward wing of the cleat was

not fit for its purpose and was therefor unseaworthy.

14. The manila rope that was part of the regular guy, as well as the cleat and preventer guy, were all part of the ship's equipment. Because of its age and condition the manila rope was not fit for its purpose, was unseaworthy, and therefor parted at the time of the accident.

15. Though the record does not disclose whether the cleat bent before or after the manila rope broke, the accident herein was proximately caused or contributed to by the unseaworthiness of the vessel in the respects set forth above.

16. Libelant did not participate in the rigging of the equipment involved in the accident.

17. Libelant, who was then 64 years of age, was removed by ambulance to the Lawrence and Memorial Hospital, New London, Connecticut, where he remained as a patient until January 3, 1954, and thereafter was treated in Saratoga Springs, New York, by a private physician until sometime in May of 1954. Libelant has not done any work since the date of the accident on October 15, 1953.

18. It was stipulated at the time of trial that medical and hospital expenses to date amount to $2,999.34, and that together with compensation payments made to him in the amount of $1200.00, there is outstanding a lien on any recovery in the amount of $4,199.34.

19. Libelant sustained the following injuries as a consequence of the accident on October 15, 1953:

a. A crushing injury of the left chest, including complete fractures of ribs of the left rib cage, extending from rib No. 3, inclusive of rib No. 12. At least five of the ribs were fractured in two places. All fracture sites show displacement and mal-union, thereby causing obvious depression inward of the chest wall.

b. A complete fracture of the left clavicle with considerable over-riding and displacements, which healed with mal-union and deformity. There is also resultant decalcification of the upper end of the left humerus, and a frozen shoulder.

c. Puncture wounds of the left lung and hemmorhage within the left lung field, requiring seven thorocenteses (chest taps) at the Lawrence and Memorial Hospital, and five more thereafter in Saratoga Springs, New York, for the removal of large quantities of rank blood at first, and then a yellowish fluid, including blood thereafter. There was also emphysema, or the escape of free air into the surrounding tissues of the left lung. As a result of the injury to this lung there is a permanent obliteration of the left costo-phrenic sinus by adhesions between the parietal and visceral pleurae. This has caused a marked diminution in the ability of the left lower lung to fully expand on inspiration and has markedly increased libelant's susceptibility to respiratory infection. There is also some flattening of the dome of the left diaphragm.

d. Damage to the nerve pathways of the left upper extremity, including a numbness of the ulnar region of the left forearm, numbness and stiffness involving the medial three fingers of the left hand, and weakness of the grasping power of his left hand. This is probably caused by pressures on the brachial plexus by the mal-united clavicle, as well as disuse atrophy following the immobilization of the left upper extremity at the hospital. A resection of the clavicle is indicated to relieve the pressures on the brachial plexus.

e. An area of sensory hypalgesia in his lower left loin approximately the size of an average palm, corresponding to the region where a large ecchymosis had been produced following the accident. There is also a long area of brownish pigmentation extending from the ankle to the tibial tuberosity of the right leg, representing permanent residua of abrasions caused by the accident.

f. A contusion of the left kidney which was the cause of blood in libelant's urine. This latter condition has since cleared, but together with the considerable loss of blood consequent on the

puncture wounds of the lung, caused a marked degree of anemia, which persisted for the duration of his hospital stay.

g. A right oblique hernia, though not noted during hospitalization, was caused to become evident thereafter and is proximately related to the accident of October 15, 1953.

h. Other injuries, including contusions and abrasions of the left side of his back, interstitial emphysema (air in the tissues of the neck, chest wall, mediastinum and right lung), shock, diminution of sensation of the left abdomen and chest and temporary displacement of the heart shadow by the fluid in the left lung area, were also noted.

20. Prior to the accident of October 15, 1953 the 64 year old libelant had been earning an average of $2000.00 a year, as a laborer in farming, construction and longshore work. His estimated life expectancy has been stipulated to be 12.63 years. Prior to the accident the libelant was well and free of complaints, and according to medical testimony, had the physical constitution of a man younger in years. By reason of the accident and the injuries set forth above, libelant is totally and permanently incapacitated from ever engaging in physical labor.

21. Libelant's loss of earnings to date are approximately $2660.00. Medical and hospital expenses to date amount to $2999.34. For the present value of the loss of future earnings by the plaintiff, and for past and future pain and suffering, permanency of the multiple injuries, including the indicated resection of the clavicle, embarrassment, disfigurement, humiliation and inability to engage in the normal activities of a man without these injuries, I find that he should be awarded the additional sum of $30,-000.00.

### Conclusions of Law

1. The Court has jurisdiction of the parties herein and the subject matter of the within suit.

2. Libelant's injuries were proximately caused by the unseaworthiness of the vessel Annitsa and the failure of the respondent Tramp Chartering Corp. to provide the libelant with a reasonably safe place to work.

3. The libelant was free of any contributory negligence.

4. The accident was in no way caused by the negligence of the impleaded-respondent, Connecticut Terminal Company, Inc.

5. Libelant is entitled to recover damages in the sum of $35,659.34 from the respondent Tramp Chartering Corp., together with interest from the date of the decree herein and costs.

6. The impleading petitions of the respondent Tramp Chartering Corp. against the impleaded respondents are dismissed, and the impleading petition of the respondent impleaded Canadian Transport Co., Ltd., against the impleaded respondent Connecticut Terminal Company, Inc., is dismissed.